# Eckman *versus* Eckman *et al.*

1. A deposition taken in an equity suit in which a devisor was plaintiff, is evidence in an ejectment for the same subject-matter in which the devisee and the defendant in the equity suit were parties, the devisee being a privy in estate.

2. If a deed cannot be treated as a bargain and sale for want of a pecuniary consideration; yet if the consideration of blood exist, it will be supported as a covenant to stand seised.

3. An uncle, in consideration of love and affection, conveyed land to nephews in fee, with this reservation: " Nevertheless, the said (uncle) reserves the rents and profits arising out of the said premises and dwellings for and during his natural life or lifetime, and at his decease, then the right of rents and profits of and in said land becomes vested in the said (nephews)." The estate in the grantees was not a freehold commencing *in futuro ;* nor was the deed testamentary or revocable.

4. A recorded deed in Pennsylvania will be construed as a feoffment, with livery of seisin or as a deed under the statute of uses as will best effect the intention of the parties.

May 5th and 6th 1871.   Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ.

Error to the Court of Common Pleas of *Lancaster county :* No. 78, to May Term 1871.

This was an ejectment by Daniel B. Eckman against Benjamin Eckman and Henry Eckman, for the undivided half of a tract of 100 acres of land.

The writ was issued February 7th 1870.

The land in dispute had been the property of Daniel Eckman, Sr., who, on the 6th of September 1859, executed a deed in fee for the land to Benjamin Eckman and Daniel B. Eckman, the sons of his brother, Jacob Eckman.   The consideration named in the deed was $8000, but no consideration was paid.   The deed was in the usual form, except the following proviso :—

" Nevertheless, the said Daniel Eckman reserves the rents and profits arising out of the said premises and dwellings for and during his natural life or lifetime, and at his decease, then the right of rents and profits of and in said land becomes vested in the said Benjamin Eckman and Daniel Eckman absolute as tenants

[Eckman *v.* Eckman.]

in common, not as joint tenants, and to their heirs and assigns forever."

It was acknowledged the same day before Daniel Fulton, Esq., and it was put upon record by John Strohm, a conveyancer.

On the 2d of February 1864, Daniel Eckman, Sr., made a deed in fee of the same land to Benjamin Eckman alone, in consideration of natural love and affection, services from Benjamin to his uncle, and $5, with the same life reservation to the grantor as in the former deed. This deed was acknowledged on the day of its date.

Daniel Eckman, Sr., died childless about November 22d 1869. having made his will, dated November 4th 1863, which was established October 26th 1869, by the verdict of a jury in an issue to try its validity.

By the will the testator, after having given a number of legacies, none to Daniel B. Eckman, gave the residue of his estate to Benjamin Eckman.

After the residuary clause the testator directed as follows :—

" But I wish it understood that I have not as yet given or conveyed away my plantation or tract of land in Strasburg township, Lancaster county, adjoining lands of David Hostetter and others, and containing 100 acres, more or less, for although I had it in contemplation to convey said tract to my two nephews, Benjamin and Daniel Eckman, as tenants in common on certain contingencies, and made a deed to that effect, I have not yet delivered said deed, the said certain contingencies not having transpired."

The principal question in the case was whether the deed of September 6th 1859, had been delivered.

On the 10th of March 1864, Daniel Eckman, Sr., filed a bill in the Court of Common Pleas, against Benjamin and Daniel B. Eckman, to have the deed and the record declared void and cancelled, on the ground that it had been delivered in escrow and the condition had not been performed, and that it had been put upon record by Strohm without authority.

Daniel B. Eckman denied the allegations of the bill and Benjamin admitted their truth. The court below dismissed the bill. The complainant appealed to the Supreme Court. In that court the opinion was delivered by Woodward, C. J., who recapitulated in his opinion many of the facts in the case and was of opinion that the proofs established a delivery of the deed. The judgment was affirmed (5 P. F. Smith 269).

The case was tried March 1st 1871, before Hayes, J. The plaintiff gave in evidence the deed September 6th 1859, from Daniel Eckman, Sr., to his nephews. He offered in evidence the above-mentioned record of the suit in equity. It was objected to by the defendants, admitted, and a bill of exceptions sealed.

The plaintiff offered to read the opinion of the Supreme Court

in that case; this was objected to by the defendants, admitted and a bill of exceptions sealed.

Also the deposition of Daniel Fulton, who was dead, taken in the equity suit; this was objected to, admitted and a bill of exceptions sealed.

Daniel Fulton said: "Daniel Eckman, Sr., and Jacob Eckman both came to see me, and said they had come to the conclusion to divide both their properties between Benjamin Eckman and Daniel B. Eckman, the sons of Jacob Eckman. Daniel brought these papers here and I drew a deed for him for a hundred acres, which he said he was going to give to Benjamin Eckman and Daniel Eckman, the sons of Jacob. He came here and signed it and acknowledged it. When it was all finished he told me he was going to leave that deed with his brother Jacob for safe-keeping, and then at his death he was to deliver it over to Benjamin and Daniel. Afterwards Jacob came here and said that Daniel had left the deed with him, and then Daniel Eckman, Sr., came along here and informed me that he had left the deed with his brother Jacob."

Daniel B. Eckman (plaintiff) testified :—

"After the death of his uncle's wife, his uncle asked witness and Benjamin to get the deed from their father and take it and a will he had made to Lancaster and have it examined whether the death of the wife would have any effect on it. Benjamin and witness got the deed from their father and gave it with the will to Mr. Amwake, who asked them where they got the papers from; Benjamin said from their father; witness said the same thing: Mr. Amwake said the death of the wife made no difference. Mr. Amwake asked what they were going to do with the papers; both said they were going to return them to their father. * * *

"Within a year after my father's death, Benjamin and I went to John Strohm's together to get deeds drawn to separate the undivided part of each property; that is, I was to convey to him my interest in the property we got from my father, and he to convey to me his interest in the property we got from my uncle Daniel. We took the deeds along, but no wills. There were deeds drawn, but not executed, because he would not comply with what I wanted, and I would not comply with what he wanted. Benjamin had in his possession, and took to Strohm's, the deed to which I have referred. Benjamin did not at that time tell me where he got uncle Daniel's deed, and I did not ask him. * * *

"It was at the instance of my uncle Daniel that we took those deeds to Strohm's. He wanted it fixed in his lifetime. We went to Strohm's, I think, in 1863. Before we went to Strohm's—but on the same day—uncle Daniel told me to have that deed, we ought to have that deed from him to Ben and me recorded. When he spoke of having it fixed, he meant the deeds between Benja-

[Eckman v. Eckman.]

min and me. He made no condition about the recording of the deed. He just said we should have that deed recorded. My father died two years before my uncle."

Daniel Lefevre said: "I was one of the appraisers of Jacob's estate. Benjamin told me he didn't want his father's estate appraised at present. He wanted to wait until his uncle Daniel's death. The reason was they had the right of it, and he didn't want it appraised, as they, after his uncle's death, had the right of it; it was their property; both of them had agreed that after his death he was to have one place, and Daniel the other. He said they had the papers. His uncle and father had fixed it all. He said, he or we had the papers. He said his uncle had reserved a life estate in it."

Christopher Hess said: "Benjamin and Daniel B. Eckman were not on good terms. I went to Benjamin to try to get them on agreeable terms to understand each other properly. Benjamin agreed that I should go to Daniel; said he was stubborn, and if he don't take care I'll have him cut short, or he will be cut short, in this other property. I said, 'Yes; in the property of your uncle Daniel in that deed your father held in his lifetime? I suppose it is that you are alluding to.' 'Yes,' he said, 'we have that deed.' He said he would like to have that home property; he always had lived upon it. I had brought them together, and Daniel consented that he should have it. I told Benjamin that his father in his lifetime had said to me that he had that deed which was delivered to him in his possession, and that it was all fixed. This was the deed from his uncle Daniel, conveying his property to his nephews. His father had said to me that it was delivered to him, and it was all right. Benjamin said, 'Yes, we have that deed.'"

Philip Miller said: * * * "On my way to Daniel's I met Benjamin, and told him I was on the way to see what could be done. He said I might tell Daniel that if he would sign off for me here, I'll sign off for him there—pointing towards his uncle Daniel's place. I then asked him—from what you say, I understand that your uncle Daniel has fixed his farm in the same way your father has his,—I having read previously his father's deed to him and Daniel for the home property. His answer was, 'Yes, yes; the same way.' I asked him if he was sure of that. He answered, 'Yes, I have it; it's here.' He said, 'Uncle had left it to daddy, or give it to daddy, and since his death it is here.'"

John Strohm said: "I was employed by Benjamin and Daniel Eckman, sometime in the spring of 1863, to draw a deed. They came to my house together and told me they wished me to write two deeds of conveyance; one of which was to convey the undivided half of a plantation in Strasburg township which had been owned by their father from Daniel B. Eckman to Benjamin Eckman; the other deed was to convey the undivided half of a tract

[Eckman *v.* Eckman.]

of land, also, in Strasburg township, which was held by their uncle Daniel Eckman, then from Benjamin Eckman to Daniel B. Eckman. I asked them what right they had to dispose of their uncle's property. They told me they had a deed for it, by which it was conveyed to them jointly. I then told them, in order to make the deeds which they wished, I must have the old titles. I should want the deed which they alleged they had from their uncle among others. I asked them whether they could get that deed. They told me they could. I then told them, if they would bring me the old titles I would make the deeds which they desired. They went away and in the course of a week returned to my house and brought the title papers, one of which was a deed executed by Daniel Eckman conveying his plantation on which he lived to Benjamin Eckman and Daniel B. Eckman. They came together again and I showed them the title papers that I had drawn, and they had some conversation and disagreed about something. They could not execute them, their wives were not along, and they separated. Benjamin insisted upon having the thing settled; but Daniel was not willing to agree to what Benjamin proposed. I am not positive whether they were there afterwards or not, but the last time they were there Benjamin said if it was not fixed that night, it would be fixed in another way."

For the defendant Benjamin Eckman, was examined and testi-fied that there was no delivery of the deed, except in escrow, on the condition that they could make the arrangement by which Daniel B. Eckman was to convey to Benjamin his interest in the father's farm, and Benjamin to convey to Daniel his interest in the uncle's farm. He also contradicted the statements of Daniel B., Lefevre, Miller, Hess and Strohm.

The defendants submitted five points, which with answers of the court are found in the assignments of error.

The court, after referring to the facts with some minuteness, said to the jury : * * *

" Upon this question of delivery, as a point of fact, it is proper for the jury to consider the circumstances, that this deed was twice in the possession of these brothers, at distant intervals, and used by them for their own benefit and advantage. In the first instance, when they came to consult a lawyer as to its validity, and in the second, when they went to Mr. Strohm to have deeds drawn, one to the other, and there are considerations belonging to each of these incidents which may aid the jury in reaching a satisfactory conclusion. [With respect to the consultation with Mr. Amwake, unless they informed him or led him to believe that the deed had been delivered, he would have told them at once that it was good for nothing, no matter how correct in form. But Mr. Amwake pronounced the deed good. He therefore was as-sured that it had been delivered. Now suppose, as Benjamin has

[Eckman *v.* Eckman.]

declared, that he obtained the deed from his uncle for this occasion, his uncle had said to him when he gave it to him, ' I do not intend by placing this deed in your hands to deliver it, but only do so on condition that you return it to me immediately after you have consulted the lawyer. You must, however, not tell him that I have not delivered it, but get his opinion whether it is a good deed.' This would have been a deception and fraud, and if the thing done were the same in effect, if the counsel were misled in regard to the fact of delivery and gave an opinion of the deed on their representation, which was not true, he was deceived as well as those who deceived him, and there was legal fraud somewhere in the transaction.]

"[So when between three and four years afterwards, the two brothers called upon Mr. Strohm to draw those deeds, he was led to believe this deed was good, that is, had been delivered, otherwise he would not have had the title he called for. Mr. Strohm knew, as every scrivener as well as every lawyer knows, that delivery is essential to the validity of a deed.]

"Again, even if this deed was at all other times in the hands of Daniel Eckman, the grantor, his giving it on these two occasions to the grantees for their use and benefit, was a complete delivery, unless there was an explicit condition attached to the giving it to his nephews on the occasion, specifying that it was not to be regarded as a delivery, but was to be returned to him as if it had not passed out of his hands, and *that*, if alleged, should be clearly and distinctly proved, otherwise the inference is reasonable and just that the delivery was complete. If the jury believe from all the evidence that this deed was given by Daniel Eckman to his brother Jacob to keep for his nephews, as Daniel Fulton, Esq., represents, the delivery was thereby sufficient and complete.

"In reference to the truth of this fact, the jury moreover may well consider the basis of the original arrangement of the two elder brothers for the benefit of these sons of the one and nephew of the other. It was perfect equality. They were to be equal owners of the two farms—tenants in common. * * * If this arrangement of the two brothers Daniel and Jacob Eckman were binding as an agreement for the benefit of others, it surely could not be changed by one of these parties without the assent of the other. It could not be changed by Daniel Eckman, Sr. Further it could not be changed without the consent of the parties for whose benefit it was made, that is Benjamin Eckman and Daniel B. Eckman, not the consent of one but both. [If then it was proper and consistent with the arrangement that it should be delivered, it is ground of presumption that it was in fact delivered, and confirms the testimony on that point.]

"Should the jury be satisfied that, in point of fact, this deed
18 P. F. Smith—30

was at any time delivered by Daniel Eckman to the grantees or to Jacob Eckman for them, it became by such delivery a perfect and valid deed of conveyance, and no subsequent possession of it by Daniel Eckman, Sr., could impair its validity or effect. It passed the title as granted, subject to the reservation of the rents and profits, and fixed the rights of the parties from the moment of delivery. If the jury therefore believe this deed was delivered, the plaintiff is entitled to recover, and their verdict should be in favor of Daniel B. Eckman."

The verdict was for the plaintiff.

The defendant took a writ of error and assigned errors as follows :—

1. The court erred in admitting in evidence the record of the suit in equity between Daniel Eckman, plaintiff, and Benjamin Eckman and Daniel Eckman, defendants. Reported, 5 P. F. Smith 269.

2. The court erred in admitting in evidence and allowing the plaintiff to read to the jury as evidence the opinion of this court in Daniel Eckman *v.* Benjamin Eckman and Daniel Eckman, reported as above.

3. The court erred in permitting the plaintiff to read in evidence in the case the testimony of Daniel Fulton, taken in the equity case of Eckman *v.* Eckman, reported as above, said Fulton having since deceased.

4, 5, 6. The parts of the charge in brackets.

7. The answer to the first point of defendant ; viz. : " Delivery of a deed is essential to its validity, and that is a question for the jury to determine. If, therefore, the jury believe that Daniel Eckman executed the instrument dated September 6th 1859, under which the plaintiff claims, with the intention of delivering it to Benjamin Eckman and Daniel B. Eckman when they were ready and willing to make certain arrangements in regard to the property described therein, which he desired them to make, and kept it in his possession until the arrangements could be carried out, and that those arrangements were not carried out on account of the refusal of the grantees therein named, or either of them, to comply with his wishes, and that the instrument continued in his possession until after his death, except when he gave it to the grantees for a special purpose, or for having the papers prepared to carry out his proposed arrangements, it never was delivered and conveyed no title to the plaintiff, and their verdict must be for the defendant."

Answer : " The first sentence in this point is correct. There being no evidence of the intention here supposed of Daniel Eckman with respect to the time of delivery of the deed, or that he kept it in his possession with a view to the arrangements mentioned in this point, if the deed was at any time delivered in point of fact

[Eckman v. Eckman.]

by Daniel Eckman his subsequent possession of it did not affect its validity."

8. The answer to the third point of the defendant; viz.:

"If the instrument of September 6th 1859, is a deed, it is a deed of bargain and sale, and the payment of the consideration mentioned therein is necessary to transfer the use and render the instrument operative. The proof is, that the consideration-money was not paid. The instrument is therefore inoperative and the plaintiff cannot recover."

Answer: "The deed is a good and valid deed if it were delivered."

9. The answer to the fourth point of the defendant; viz.:

"The instrument in question contains a reservation of the rents, issues and profits to the grantor for his life, which, at his death, were to vest in the grantees. This reservation limits the fee to take effect *in futuro*, which, at common law, can be done only where the estate is *granted*, not *reserved*. The instrument, therefore, conveys no estate to the plaintiff and he cannot recover."

Answer: "The instrument in question is good and valid if it was delivered."

10. The answer to the fifth point of the defendant; viz.:

"The instrument in question is a testamentary instrument and is therefore revocable. It is revoked by the will of Daniel Eckman, the grantor, and by his subsequent deed, and is therefore inoperative and conveys no title to the plaintiff."

Answer: "The instrument in question is a good deed of grant, bargain and sale, operative according to its terms, and, if delivered supersedes all subsequent instruments, deeds or wills of Daniel Eckman, Sr., contrived to defeat its operation or effect."

*D. G. Eshleman* and *D. W. Patterson*, for plaintiffs in error, as to the admission of the evidence: 1 Starkie on Ev. 192, 196, 197; The Borough of York v. Forscht, 11 Harris 392; Philadelphia v. Girard's Heirs, 9 Wright 9; Noble v. McClintock, 6 W. & S. 58; Dimes Savings Inst. v. Allentown Bank, 15 P. F. Smith 116.

The court misled the jury by submitting to them as facts proven, matters about which there was no evidence which is error: Snyder v. Wilt, 3 Harris 59; Herdic v. Bilger, 11 Wright 60; Burford v. McCue, 3 P. F. Smith 427; Updegraff v. Rowland, 2 Id. 317: and they still further injured the plaintiff in error by basing a string of ingenious presumptions upon those alleged facts which had no existence in the case. It was the duty of him who alleged delivery of the deed to prove the fact: Bickham v. Smith, 5 P. F. Smith 337; Kelly v. Kauffman, 6 Harris 351.

Where there is some evidence of a material fact it is the duty of the court to submit it to the jury: Cole v. Bolard, 10 Harris

[Eckman *v.* Eckman.]

431; Fitzwater *v.* Stout, 4 Id. 22. As to the revocability of the deed: Turner *v.* Scott, 1 P. F. Smith 126; Perry *v.* Scott, 1 Id. 120; Miller *v.* Casselbery, 11 Wright 378; Frederick's Appeal, 2 P. F. Smith 338.

*Franklin,* for defendant in error.—As to the delivery: Doe dem. Garnons *v.* Knight, 5 Barn. & Cress. 671; Stephens *v.* Huss, 4 P. F. Smith 20. A deed cannot be delivered to a grantee as an escrow: 3d Cruise's Dig., 30, *Deed,* Chap. 2, § 58; Thoroughgood's Case, 9 Reports 136; Simonton's Estate, 4 Watts 180. In the absence of fraud, the validity of a deed cannot be impeached by proof of non-payment of the consideration-money therein mentioned: Wilt *v.* Franklin, 1 Binn. 518. Since the passage of the Statute of Uses, courts have recognised the validity, force and effect of deeds of this character: Wilkinson *v.* Tranmer, 2 Wilson 75; Milburn *v.* Salkeld, Willes' Rep. 670; Fisher *v.* Strickler, 10 Barr 348; 3 Cruise's Dig. part 4, 186, &c. As to the revocability of the deed: Greenfield's Estate, 2 Harris 489; Ritter's Appeal, 9 P. F. Smith 9.

The opinion of the court was delivered, May 18th 1871, by

SHARSWOOD, J.—The first three assignments of error are not according to Rule VIII., 6 Harris 578, and must therefore be dismissed. We may say, however, as matter of grace and not of right, that the plaintiff in error suffers nothing by these errors not having been properly assigned. Benjamin Eckman claiming in this ejectment as the devisee of Daniel Eckman, who was the plaintiff in the equity suit, the record of that suit was clearly evidence against him as privy in estate; and this being so, the testimony of Daniel Fulton, taken in that proceeding, was also admissible. It is within the letter and spirit of the Act of March 28th 1814, 6 Smith 208, which declares "that any deposition taken or to be taken in any cause which, by the rules of law, may be read in evidence in the cause in which it is or may be taken, shall be allowed to be read in evidence in any subsequent cause wherein the same matter shall be in dispute between the same parties or persons, their heirs, executors, administrators or assigns." The subject-matter of that suit was the title to this land, and the particular question involved the same as here, the delivery of the deeds—Daniel Eckman to Benjamin Eckman and Daniel B. Eckman, dated September 6th 1859; and Benjamin Eckman is the assignee in law of Daniel Eckman. We have had more difficulty as to the admissibility of the opinion of the court in that case. It was properly perhaps no part of the record. But it seems to fall within the decisions in Carmony *v.* Hoober, 5 Barr 305, and Coleman's Appeal, 12 P. F. Smith 252, that such an opinion may be resorted to as evidence that the decree or

[Eckman *v.* Eckman.]

judgment was upon the merits and not upon any incidental or collateral question. No point was made below as to the effect of the decree—whether it was a decision upon the main question and conclusive—nor has such point been raised in this court. Had the plaintiffs in error wished to exclude the opinion so far as it respected the statement of facts, they should have requested the court to charge that though admitted and read in the cause for another purpose, it was no evidence of any fact, and in that point of view was to be dismissed from their consideration.

The 4th, 5th and 6th points complain of the charge of the court and may be considered together. The learned judge below was of the opinion that the weight of the evidence was in favor of the delivery of the deed. This court thought so upon the same testimony in Eckman *v.* Eckman, 5 P. F. Smith 269, and we all agree in thinking so now. The opinion of the judge below was indeed very strongly expressed to the jury, but they were explicitly told at the same time that the question was for them to decide. We cannot say that there was any abuse of the discretionary power of the court to express their opinion upon the sufficiency of the evidence or that the jury were misled. In stating the evidence of Messrs. Amwake and Strohm, the learned judge may have been mistaken in attributing to them what was only a legitimate inference from their testimony. It was really immaterial what their opinions may have been on the question of the goodness of the deed: the important bearing of their testimony was the almost necessary, nay, inevitable inference that the two brothers had consulted them together without raising any objection to the deed on the score of its non-delivery. If there was a mistake committed as to their testimony it was evidently an inadvertent one, and had his attention been called to it at the close of the charge, the learned judge would have referred to his notes and either corrected the one or the other according to the fact. Upon a difference of opinion between the court and counsel I have frequently seen the witness himself recalled and asked to repeat what he had said. We do not think that the jury were misled by anything in these portions of the charge here assigned for error, and these assignments are therefore dismissed.

The 7th error assigned is to the answer of the learned court to the first point of the defendant below. The judge instructed the jury that there was no evidence that it was the intention of Daniel Eckman at the time of the execution of the deed not to deliver it until the grantees should make certain arrangements between themselves in regard to the property. Nor was there any such evidence, unless afforded by what occurred subsequently to the death of Jacob Eckman, and Daniel's desire then that such arrangements should be made. Had these things followed close upon the execution of the deed they might have afforded some

grounds for the inference, but the date of the instrument is September 6th 1859, and Jacob Eckman died in 1862, three years after, leaving his elder brother Daniel, the grantor in the deed, to survive him. It was in the spring of 1863 that the two brothers, Benjamin and Daniel B., called upon Mr. Strohm to make amicable partition of the two farms, by mutual releases. It was then after the deeds of release were drawn, and were ready to be executed, that this unfortunate controversy between the two brothers arose by a disagreement about the profits, taxes and repairs of the farm derived from the will of their father, and then vested in them as tenants in common. We think it would not be a legitimate inference from this that old Daniel Eckman had originally intended that his nephews should make such an arrangement and not to deliver the deed unless they did.

The answers of the learned judge to the 3d and 4th points of the defendant below, which form the subject of the 8th and 9th assignments of error, were clearly right. It is one of the best established principles, for which no reference to authorities is necessary, that a deed shall always be so construed as to give it effect; *ut res magis valeat quam pereat*. If it cannot be treated as a deed of bargain and sale because there was in fact no pecuniary consideration, yet if the consideration of blood did exist it shall be supported as a covenant to stand seised. *Quacunque via data*, therefore, this deed was good, and conceding that the reservation to the grantor of the rents and profits arising out of the premises, was a life estate in the land itself, the remainder to the grantees was not a freehold commencing *in futuro*, but a future springing use, taking effect under the Statute of Uses. We may say here that in Pennsylvania a recorded deed will be construed as having the effect of a feoffment with livery of seisin or as a deed under the Statute of Uses, as will best accomplish the intention and design of the parties: Act of May 28th 1715, § 5, 1 Smith L. 95.

The 10th assignment of error, which complains of the answer to the 5th point of the defendant below, raises the question whether the deed of September 6th 1859 is not a testamentary instrument: by reason of the reservation to the grantor of the rents and profits for life. It is contended that it falls within the principle of Turner *v.* Scott, 1 P. F. Smith 126. There was a provision in the deed in that case not to be found in this: "this conveyance in no way to take effect until after the decease of the said John Scott, the grantor." Although in form a grant, these words were supposed to indicate that it was nothing but a declaration of what the grantor willed to be done after his death. But there is nothing of the kind in this instrument. It is a grant— and whether a bargain and sale or a covenant to stand seised, it enures to the use of the grantor for life, and after his death to the

use of his nephews, the grantees, in fee simple, and there being no power of revocation contained in the instrument it was irrevocable.

Judgment affirmed.